

OA 91  Criminal Complaint

# United States District Court

| NORTHERN | DISTRICT OF | CAILFORNIA |

UNITED STATES OF AMERICA
V.

Mabelle de la Rosa Dann aka Mabelle Crabbe

**CRIMINAL COMPLAINT**

Case Number: **4 - 08 - 70330**

**WDB**

*ORIGINAL*

# FILED

JUN - 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my
knowledge and belief. On or about July 2006 - April 2008   in Contra Costa   County, in
                                        (Date)
the  Northern  District of  California   defendant(s) did,

(Track Statutory Language of Offense)

did knowingly and in reckless disregard of the fact that an alien has come to, entered, and remained in the United States in violation of the law,
concealed, harbored and shielded from detection and attempted to so do, such alien in any place

in violation of Title **8**   United States Code, Section(s)  1324(a)(1)(A)(III)

I further state that I am a(n)  Special Agent with ICE   and that this complaint is based on the following facts:

See attached affidavit of SA Jennifer Alderete, ICE

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

Approved
As To
Form: _____  AUSA

Sworn to before me and subscribed in my presence,

_____
Date   5 June 08

Bernard Zimmerman, Magistrate Judge
Name & Title of Judicial Officer

_____
Name/Signature of Complainant

at _____
City and State

_____
Signature of Judicial Officer

**AFFIDAVIT**

I, Jennifer J. Alderete, being duly sworn, hereby depose and state as follows:

**I. INTRODUCTION**

1. I am a Special Agent with the United States Immigration and Customs Enforcement ("ICE"), within the United States Department of Homeland Security ("DHS"). I have been employed in this capacity since January 2008. I am currently assigned to the ICE Human Smuggling/Trafficking Group, in the San Francisco Office. Before joining ICE, I was employed as a Special Agent with the U.S. Department of Labor, Office of Inspector General, from December 2001 through January 2008. I have participated in numerous investigations involving labor related issues, including visa and labor certification fraud, the harboring of illegal aliens, wage violations, labor racketeering, pension and health related fraud. In accordance with my duties as a Special Agent, I am assigned to investigate violations of federal laws, including Conspiracy to Harbor an Illegal Alien and Induce an Alien to Enter the United States, 18 U.S.C. § 371; Bringing in and Harboring Certain Aliens, 8 U.S.C. § 1324; Fraud and Misuse of Visas, Permits, and Other Documents, 18 U.S.C. § 1546; Involuntary Servitude, 18 U.S.C. § 1584; Trafficking, 18 U.S.C. §§ 1589-92; and Peonage, 18 U.S.C. § 1581.

**II. PREMISE TO BE SEARCHED**

2. This affidavit is submitted in support of an arrest warrant for MABELLE DE LA ROSA DANN also known as MABELLE CRABBE ("DANN"), a complaint, and a search warrant to search the premises of Apartment #64, 1011 Ygnacio Valley Road, Walnut Creek, California, 94598, and a vehicle described as a four door 1997 Honda Accord license # 3XBH933, as described in Attachment A, to seize certain items which are the fruits, instrumentalities and/or evidence of violations of 18 U.S.C. § 371, Conspiracy to Harbor an Illegal Alien and Induce an Alien to Enter the United States, and 8 U.S.C. § 1324, Bringing in and Harboring Certain Aliens as described in this affidavit and Attachment B.

3. The statements contained in this affidavit are based on my own investigation, my training and experience as a law enforcement agent, on information provided to me by and or through other law enforcement agents, investigators and individuals with knowledge of this matter, and on information

1  I have obtained through my review of documents. This affidavit summarizes such information but

2  does not purport to set forth all of the evidence gathered to date in this investigation. Based upon

3  the information below, there is probable cause to believe that evidence and instrumentalities of

4  Conspiracy to Harbor an Illegal Alien and Induce an Alien to Enter the United States, 18 U.S.C. §

5  371 and Bringing in and Harboring Certain Aliens, 8 U.S.C. § 1324, will be found in the residence

6  and vehicle described in Attachment A.

7  ### III. DOCUMENT RETENTION

8  4.  Based on my training and experience, as well as information I obtained from other

9  experienced agents in my group, I know that:

10 - Persons involved in the filing of fraudulent applications with the US Citizen Immigration
   Services ("CIS") often keep in their residences and/or vehicles genuine identity documents
11 and/or copies of such identity documents, including, but not limited to, passports, visas, birth
   certificates, social security cards, photo identifications, and/or documents which are or have been
12 issued by the CIS as proof of alien registration.

13 - Persons involved in the transportation of illegal aliens into the United States and/or the harboring
   of illegal aliens in the United States often keep in their residences and/or vehicles genuine
14 identity documents, and/or copies of such identity documents, including, but not limited to, birth
   certificates, social security cards, various forms of photo identification, and/or travel documents,
15 including, but not limited to, passports that may contain travel entry or exit stamps, visas, airline
   tickets or itineraries, and/or documents which are or have been issued by the CIS as proof of
16 alien registration.

17 - Persons involved in the above-described activities often keep in their residences and/or vehicles
   tax returns or other documents, including, but not limited to, applications for Insurance benefit
18 applications, medical records, etc., that list persons who are not family members as family
   members, or persons who are not legitimate dependents as dependents.
19
   - Persons involved in such activities commonly maintain addresses or telephone numbers in
20 books, papers, and/or electronic devices that reflect names, addresses, and/or telephone numbers
   of their associates and co-conspirators; or that reflect names, addresses and/or telephone numbers
21 of aliens who have been illegally brought into the United States or are being harbored in the
   United States; or that reflect names, addresses and/or telephone numbers of the family members
22 and associates of those aliens.

23 - Persons involved in such activities, particularly the harboring of illegal aliens, keep in their
   residences and/or vehicles, personal belongings of the victim(s) who were brought into the
24 United States and/or were harbored, including, but not limited to, letters written to/and by the
   victim(s), photographs belonging to or depicting the victim(s), and clothing and other personal
25 belongings of the victim(s).

26 - Because persons who commit the crimes of harboring and bringing in aliens into this country
   often require the assistance of persons outside the country in order to successfully bring in or
27 harbor aliens, persons involved in such activities routinely maintain in their residences and/or

28

2

1    vehicles, letters to and from other coconspirators, including coconspirators from outside the
2    country who are involved in assisting in the illegal activities. In addition these persons
communicate through emails and make financial transactions over the computer with each other.

3

## IV. INVESTIGATION

4    5. This investigation began in May 2008, when law enforcement officials were alerted to

5    allegations that DANN, who resides at Apartment #64, 1011 Ygnacio Valley Road, Walnut Creek,

6    California, 94598, had harbored and held a Peruvian female, Zoraida Pena-Canal ("Pena") in her

7    home in Walnut Creek, California, exploiting her as a free domestic servant. Upon receiving this

8    information I, along with other law enforcement officers, interviewed numerous individuals

9    including the victim Pena. I have also reviewed documents including, but not limited, to those listed

10    below:

11      •     Alien Files of DANN, DANN's family members, and Pena;

12      •     Property and lease records;

13      •     DHS' Customs and Border Protection travel records;

14      •     California Department of Motor Vehicle records;

15      •     Police reports;

16      •     Pacific Gas & Electric records;

17      •     Airline records;

18      •     Department of State visa application records;

19      •     Law enforcement databases.

20    6. Based upon my investigation including, but not limited to, interviews with witnesses,

21    interviews with law enforcement officers, and the review of documents and databases described

22    above, I believe that there is probable cause to believe that DANN conspired to and smuggled Pena

23    into the United States and harbored her in her residence in Walnut Creek, forcing her to work

24    without pay as a domestic servant from July 2006 through April 2008, when Pena escaped.

25    Whenever in this affidavit I assert that a statement was made by an individual, that statement is

26    described in substance and in part, and is not intended to be a verbatim recitation of such statement.

27    Additionally, this affidavit is not intended to include each and every fact and matter known to the

28

government relating to the subject matter of this investigation. Instead, this affidavit contains only those facts that are necessary to establish that there exists probable cause that DANN committed the crimes listed above, and that fruits, evidence and instrumentalities of the above-referenced criminal violations will be found at the target locations.

7. The Trafficking Victims Protection Act provides that Victims of Severe Forms of Trafficking in Persons who are aliens and potential witnesses to such trafficking may be allowed to remain temporarily in the United States to effectuate prosecution of those responsible for the trafficking. This temporary status in the United States is known as Continued Presence. Included in Continued Presence are benefits that include work authorization and Health & Human Services benefits. Continued Presence does not convey permanent status in the United States, though individuals in Continued Presence often apply for and receive T-Visas, allowing them to remain legally in the United States for a period of three (3) years after which they can apply for Legal Permanent Residency. Continued Presence can be revoked at the discretion of ICE if evidence should be obtained that the alien who has been certified for Continued Presence is not a Victim of Severe Form of Trafficking. A Continued Presence application has been filed for Pena along with an application for an employment authorization card.

A. **Conspiring and Harboring Illegal Alien For Financial Gain:**

8. Pena is a 30 year old Spanish speaking native and citizen of Peru. In July 2006, Pena was brought into the United States on a B1 visitor visa, through an agreement reached between DANN, a native of Peru and a naturalized United States citizen and Silvana La Rosa Fonseca ("La Rosa"). This visa only allowed Pena to remain in the United States for three months as a domestic employee of La Rosa. However, DANN, La Rosa and Pena agreed that Pena would actually work for DANN (not La Rosa) as a domestic employee and would stay in the United States indefinitely, working for DANN for at least two years.

9. In approximately 2001, DANN learned of Pena through DANN's sister Martha, for whom Pena worked. Martha, who lived in Peru, told DANN that Pena was a good nanny and housekeeper. In July 2002, Pena began working for DANN as a nanny in Peru. At this time, DANN began trying

4

1  to bring Pena into the United States to work for her as a domestic servant with a contract that had

2  terms that comported with United States labor standards. In reality, DANN and Pena had a contract

3  with the following terms that would govern her employment in the United States: Pena would make

4  $600.00/month; receive 2 days off per week, provide childcare, be allowed to study English, and

5  work from approximately 6:00 a.m. to 4:00 - 6:00 p.m. in the evening, depending on DANN's work

6  hours. DANN showed Pena a photograph on the internet, depicting the large house in California

7  where they would live and the large bedroom and private bathroom that Pena would live in. DANN

8  explained that she would deduct Pena's plane ticket from her pay as follows: the first month in the

9  United States, DANN would pay Pena $200.00; the second through fifth month, DANN would pay

10 Pena $300.00; then beginning the sixth month Pena would make $600.00 per month.

11     10. On August 13, 2002 and October 29, 2002, the U.S. Embassy refused Pena's application for

12 a visitor visa to come to the United States to work for DANN. Beginning in June 2005, DANN hired

13 a Peruvian woman named "Sylvia" to advise La Rosa and Pena on how to navigate the visa process

14 and smuggle Pena into the United States on a visitor visa, so that she could reside with and work for

15 DANN as a housekeeper and nanny. Sylvia worked to prepare La Rosa and Pena on how to pass the

16 Embassy interview since Pena's two previous visa applications (August 13, 2002 and October 29,

17 2002) were denied. This time, a B1 visa was granted, allowing Pena to stay in the United States for

18 three months only. La Rosa was paid a one time fee of approximately $7,000.00, including airfare

19 for La Rosa and for Pena.

20     11. On July 27, 2006, Pena and La Rosa flew on American Airlines from Lima, Peru to Miami,

21 Florida, and on to San Francisco, California. La Rosa held Pena's passport and visa from some time

22 in 2005 through their trip to San Francisco. DANN met La Rosa and Pena at the San Francisco

23 Airport. At that time, La Rosa gave DANN Pena's passport, visa and Peruvian identification. I have

24 corroborated Pena's and La Rosa's date of entry into the United States through ICE records. I have

25 also confirmed with American Airlines that both Pena's and La Rosa's tickets were purchased with

26 DANN's Mastercard.

27

28

12. Initially, from July 27, 2006 through September 2006, Pena lived with DANN, her three children and DANN's mother at DANN's mother's apartment in Walnut Creek, California. Then, from September 2006 through April 16, 2008, Pena, DANN and her three children moved into a 900 square foot apartment, Apartment #64 at 1011 Ygnacio Valley Road in Walnut Creek, California. Throughout this time, Pena took care of the children, cooked and cleaned.

13. For the first year Pena resided in the United States, Pena rarely left the apartment. Pena worked for DANN approximately seven days a week from early in the morning until late in the evening, caring for DANN's three young children, cleaning the apartment, cooking for DANN and her children, and washing their laundry. Beginning in August 2006, Pena began picking up DANN's children from school and walking them home (1.5 miles in one direction). DANN timed Pena when she went to get the children by calling her on the apartment's telephone before she left and when she returned. As the months went by, Pena befriended individuals at the school who eventually helped her escape from DANN. Through my interviews of the victim and Cooperating Witnesses 2 and 3 ("CW2" and "CW3"), I have corroborated this information. CW 2 and CW 3 stated that they saw Pena pick up DANN's children from school. They stated that Pena appeared unkempt and wore the same clothing each day. Throughout the time period she worked for DANN, DANN failed to provide her with any compensation.

14. DANN exerted tremendous control over Pena. DANN held Pena's visa, passport and Peruvian identification and took at least the passport with her in a black briefcase when she left the apartment. Throughout the time she was in the United States, Pena did not have control or access to her passport, visa or identification card. Frequently, DANN threatened Pena with deportation and by reminding her that she was illegally in the United States and had no rights. DANN told Pena that she would (falsely) accuse Pena (to the authorities) of stealing money from her if Pena left. DANN told Pena not to talk to anyone, that she could not trust anyone in the United States, that people were dangerous and would take DANN's children, and because Pena had no papers and did not speak English, if anyone discovered her here she would be deported. DANN took Pena's radio away and broke it, telling Pena that she did not want her to listen to Spanish speaking radio because it would

6

1   put ideas in her head. DANN also broke her mother's television when she learned that Pena had

2   listened to Spanish television programs on DANN's mother television. DANN also told Pena that

3   when you come to the United States you must suffer.

4       15. DANN verbally abused Pena. The verbal abuse escalated in the Fall/Winter of 2007-2008

5   and occurred on a regular basis. On one occasion, in March 2008, DANN accused Pena of stealing

6   money from her purse and screamed at her, grabbing Pena around the neck. On a 2007 - 2008

7   calendar on the kitchen wall of DANN's apartment, Pena made marks in red "x's" to indicate

8   whether or not she had been verbally abused by DANN. This calendar is described as an Indian

9   Valley School calendar in various colors displaying different animals.

10       16. Initially, Pena slept in the living room of DANN's apartment, on a sofa. Later DANN told

11   her to sleep on the floor of the living room, with a sheet and three blankets, which are roughly 6 feet

12   by 6 feet, described as (1) a sky blue and white blanket with baseball print; (2) a white blanket; (3)

13   a tan blanket; and (4) a beige sheet. Pena left the blankets, sheet and her pajamas in a clear plastic

14   bag in the living room when she fled the residence on April 16, 2008. As time went on, DANN

15   began to ration the food eaten by Pena. DANN weighed the meat she purchased at the grocery store

16   and at home and counted the number of fruit in the household. DANN forbade Pena from eating

17   fruit and ultimately began hiding food in her room to k

18   eep it from Pena.

19       17. In December 2006, DANN gave $100.00 to Pena. Pena asked if it was a gift or her pay.

20   DANN told her it was a gift and her pay was $600.00 per month.

21       18. In March 2007, DANN opened a bank account at Washington Mutual Bank in Pena's name,

22   telling Pena this account was where DANN was going to put Pena's pay, using the address of the

23   target location (Apartment #64). In October 2007, DANN explained to Pena that she had not been

24   paying her as agreed and did not know how to tell her. DANN said that instead of paying Pena,

25   DANN had been deducting $300.00 per month for Pena's work from the debt Pena owed her.

26   DANN stated the debt totaled $7,000.00, which included the airline tickets for Pena and La Rosa and

27   the fee DANN had paid Sylvia and La Rosa for bringing Pena to the United States. As time went

28

1  on, DANN added numerous other items to Pena's debt, including DANN's expenses in Peru,

2  including her costs of searching for nannies prior to hiring Pena, touring Peru, clothing and other

3  items DANN had bought for Pena, and clothing DANN had bought for her children, increasing

4  Pena's debt to roughly $13,000.00 to $15,000.00. Later, in April 2008, after she escaped, Pena

5  closed the Washington Mutual account over the phone with the assistance of a friend Cooperating

6  Witness 1 ("CW1") and left the remaining $450.00 frozen in the account.    These bank statements

7  were mailed in Pena's name, to Apartment #64 and DANN kept them in her room, on her bedroom

8  desk and in her locked briefcase. DANN kept the ATM card for this account, which was in Pena's

9  name, on her bedroom desk.

10      19.  During the investigation, numerous witnesses have corroborated Pena's presence in the

11  United States and her work for DANN. I have interviewed CW2 and CW3 who have confirmed that

12  Pena picked DANN's twin boys up from the Indian Valley Elementary School in Walnut Creek on

13  a regular basis and that she shared with them details of what was happening to her, including the fact

14  that she was not paid, her food was restricted, and she was being abused by DANN.

15  **B.  Items believed to be at residence**

16      20.  Based on my investigation , experience, and training, I believe there is probable cause to

17  believe that there will be evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 371,

18  Conspiracy to Harbor Pena, an Illegal Alien and Induce Pena to Enter the United States, and 8 U.S.C.

19  § 1324, Bringing in and Harboring Pena at Apartment #64.  Based on my investigation, training, and

20  experience, I believe that there will be evidence and indicia at Apartment #64 that relates to these

21  crimes.  A detailed list of items to be searched for and seized at Apartment #64 is set forth in

22  Attachment B to this affidavit.

23      21.  Based on my investigation, experience, and training, I also believe that there is probable

24  cause to believe that DANN's cell phone, answering machine, laptop computer, and two personal

25  computers located at Apartment #64 will contain evidence and are instrumentalities of the violations

26  being investigated.  Therefore, I am requesting that the search warrant authorize law enforcement

27  to search these items for evidence and as instrumentalities of the violations being investigated.

28

1   Based on my experience and training, I know that the cell phone will contain a directory and history

2   of phone calls that may remain for an extended period of time.

3       22.  Based on my investigation, experience and training, I also believe that the computers or

4   electronic media located at Apartment #64 will contain e-mails, photographs, videos, or

5   correspondence related to violations being investigated.  Therefore, I also request that the search

6   warrant authorize the search and seizure of any computers or electronic media at Apartment #64, as

7   specified in more detail in Attachment B to this affidavit and in accordance with the protocol set

8   forth in Attachment C to this affidavit, with both attachments incorporated by this reference.

9       23.  During my interview of Pena, I have learned that she left the following items behind in

10  DANN's home when she fled on April 16, 2008 –

11  - Personal items in a linen closet in the hall off of the living room, including —
        - Black leather boots, approximately size 6, zip up, pointy toes, ankle length, tall heels;
12      - Small/medium, wool blue blazer with large buttons and a belt, and a striped white
          and black nylon lining, brand name "Gap";
13      - Brown jacket with red and green lining;
        - Turquoise bathing suit;
14      - Red cotton vest, with cowl neck and elastic waist;
        - Beige hooded sweater with feathers;
15      - Assorted t-shirts and undergarments;
        - Sky blue and pink pajamas;
16      - Green and white pajamas;
        - White and green battery operated toothbrush;
17      - Small white zipped bag containing makeup;
        - Purple bag containing perfume and candles;
18      - Black leather purse without pockets, containing earrings;
        - Radio;
19      - Black nylon duffle bag, approximately 3 feet by 1 foot, with white lettering, handles
          and a zipper and two pockets on each side.

20

    - Additional personal items left in the residence, vehicle, or on DANN's person –
21      - Pena's passport, visa, and Peruvian identification kept in a ziplock bag and contained
          within DANN's black briefcase with wheels;
22      - Pink sandals left in a brown basket near the front door in the living room;
        - Sky blue and white blanket with baseball print;
23      - White blanket;
        - Tan blanket;
24      - Beige sheet.

25      24.  Through my investigation, I have learned that there are numerous items of additional

26  evidence, documenting and corroborating Pena's presence and work in DANN's residence, including

27  but not limited to –

28
                                        9

- Index cards, approximately 5" by 3" in size, with handwritten chores for Pena to perform, last seen on approximately April 15, 2008, in a drawer in the kitchen next to the stove;

- DANN's handwritten or typed notes documenting Pena's debt to her, maintained on DANN's bedroom desk.;

- Employment contracts involving Pena;

- DANN's digital camera, photographs, video camera and videotapes which have documented Pena, including but not limited to:
  - Photograph of Pena and DANN's children on a bookshelf in the living room.
  - Videotape of Pena and DANN's children at a 2007 birthday party.

- International calling cards.

25. I have learned through my investigation that DANN used her cell phone several times a day to contact Pena at the residence in order to confirm her presence at DANN's residence, at times leaving messages on the residence telephone answering machine. Pena also left voice messages on DANN's cell phone, including ones on March 26, 2008 and March 27, 2008.

26. On April 16, 2008, after Pena left DANN's apartment, a cooperating witness Cooperating Witness 4 ("CW4") reported DANN's abusive conduct to La Raza, a nonprofit organization, located in San Francisco, California. La Raza notified ICE. On this same day, police officers with the Walnut Creek Police Department went to DANN's residence and confronted DANN's mother and later DANN. Both DANN and her mother denied having any of Pena's belongings. ICE has corroborated this by reviewing the police report and speaking with the police officers.

27. During the time she was kept at DANN's home, Pena was illegally in the country, as she initially came in under a visa requiring her to work for La Rosa and then continued on in the United States beyond her three month visa working for DANN. Based on my investigation, I believe that DANN was aware Pena was in the United States illegally.

C. **Target Search Locations**

28. As noted above, this affidavit requests a search warrant for the residence known as Apartment #64, 1011 Ygnacio Valley Road, Walnut Creek, California, 94598, the location at which Pena was kept from approximately September 2006 through April 2008, and for DANN's vehicle. I have confirmed that DANN resides at this address through a check of California Department of

10

Motor Vehicle ("DMV") records, Pacific Gas & Electric records and lease records. The lease agreement for the apartment, signed by DANN, shows she began occupying the premises on September 15, 2006. This lease agreement lists the individual occupants of the apartment as DANN and her three children – it does not list Pena. Both the landlord and handyman told me that they did not know any other adult resided at the apartment. I have learned from an interview with the landlord and handyman of the apartment, that DANN and her children continue to live at this residence. On June 5, 2008, ICE agents conducted surveillance of the apartment and witnessed DANN and her mother at the apartment. The DMV has DANN's 1997 Honda Accord license # 3XBH933 registered to the target residence. Based on my experience and on discussions with those in my group, I know that the items listed above and in Attachment B are kept by persons involved in the above-listed crimes for long periods of time and I believe that fruits, evidence and instrumentalities of the listed crimes will be found at the target residence and automobile.

## V. PERMISSION TO SEIZE COMPUTER SYSTEMS AND PERIPHERALS

29. During the course of my investigation, I learned from Pena that DANN has three computers: (1) a personal computer in the living room; (2) a laptop that DANN carries in her briefcase; (3) a personal computer in the children's room. Pena told me that DANN has a digital camera and video camera which have documented Pena's presence in the United States. I also learned from Pena that DANN uploaded photographs and videos from her digital camera and video camera onto her laptop computer and onto her personal computer in the living room. Based on my experience and based on the experience of agents I work with, I understand that individuals like DANN who employ individuals as domestic servants, inadvertently take photographs and videos of these individuals at family functions and other events. These photographs and videos are generally saved on persons like DANN's computer for family records and are evidence of Pena's presence in DANN's residence and corroboration of her domestic work for DANN. I have learned that the digital camera is maintained in a black 12" by 7" nylon bag with video tapes and kept in DANN's bedroom closet.

30. DANN opened an email account in Pena's name and one in her own name. In my experience and based on the experience of agents I work with, I understand that individuals like

1  DANN generally use their email accounts to correspond to their relatives and friends in foreign
2  countries to discuss their lives and the lives of those with whom they live.

3     31.  The agents will use the protocol attached to this affidavit as Attachment C to search and
4  seize computer systems and peripherals located at the premise.

5     32.  Based on my knowledge, training and experience, I know that deleted information remains
6  imaged on the hard drive and therefore is retrievable by a computer forensics expert.  I also know
7  that the presence of a computer in an office frequently indicates that business books and records are
8  being maintained on the computer.

9     33.  Computer hardware, software, documentation, passwords, and data security devices may be
10 important to a criminal investigation in two distinct respects: (1) the items themselves may be
11 instrumentalities, fruits, and/or evidence of crime; and/or (2) items may have been used to collect
12 and store information about crimes (in the form of electronic data).  Thus, Rule 41 of the Federal
13 Rules of Criminal Procedure permits the government to search and seize computer hardware,
14 software, documentation, passwords, and data security devices which are: (1) instrumentalities, fruits
15 and/or evidence of crime; and/or (2) storage devices for information about crimes.

16    34.  Based on my knowledge, training, and experience, I know that searching and seizing
17 information from computers often requires agents to seize most of all electronic storage devices
18 (along with related peripherals) to be searched later by a qualified computer expert in a laboratory
19 or other controlled environment.  This is true because of the following: I know that data analysts may
20 use several different techniques to search electronic data for evidence or instrumentalities of crime.
21 These techniques include, but are not limited to, the following: (1) examining the directories and
22 subdirectories for the lists of the files they contain; (2) "opening" or reading the first few "pages"
23 of selected files to determine their contents; (3) scanning for hidden or deleted data; (4) searching
24 for key words or phrases ("string searches").  I also know that searching and seizing information
25 from computers often requires agents to seize most or all electronic storage devices (along with the
26 related peripheral drives) to be searched by a qualified computer expert in a laboratory or other
27 controlled environment.

28

12

1      *a. Volume of evidence.* Computer storage devices (like hard disks, diskettes, tapes, laser

2   disks, Bernoulli drives) can store the equivalent of thousands of pages of information. Additionally,

3   a suspect may try to conceal criminal evidence; he or she might store it in random order with

4   deceptive file names. This may require searching authorities to examine all the stored data to

5   determine which particular files are evidence or instrumentalities of crime. This sorting process can

6   take weeks, depending on the volume of data stored, and it is impractical to attempt this kind of data

7   search on site.

8      *b. Technical requirements.* Searching computer systems for criminal evidence is a highly

9   technical process requiring expert skill and a properly controlled environment. The vast array of

10   computer hardware and software available requires even computer experts to specialize in some

11   systems and applications, so it is difficult to know before a search which expert is qualified to

12   analyze the system and its data. Data search protocols are exacting scientific procedures designed

13   to protect the integrity of the evidence and to recover "hidden", erased, compressed, password-

14   protected, or encrypted files, and computer evidence is extremely vulnerable to inadvertent or

15   intentional modification or destruction (both from external sources or from destructive codes

16   imbedded in the system as a "booby trap"). A controlled environment is therefore essential to the

17   complete and accurate analysis of computer information. Accordingly, I respectfully seek authority

18   to search electronic data, and, if necessary, to seize all pertinent electronic storage devices (along

19   with related peripheral drives) to be searched by a qualified computer expert in a laboratory or other

20   controlled environment.

21      35. The agents/computer personnel searching for such information seek authorization to search

22   any desktop, other "personal computer," laptop or personal computer located on the premises to be

23   searched and to copy the information stored on such computers. They further seek authorization to

24   search for any and information that may be stored on magnetic media, including computer hard

25   drives, diskettes, tapes, or any other media capable of storing information in a form accessible

26   through the use of a computer or word processor. The computer forensics expert, when searching

27   for evidence authorized under the warrant, will take reasonable steps to avoid searching for and

28                                      13

viewing documents which are not authorized under the warrant. These steps include the identification of non-pertinent directories and files. The computer forensic expert will not disclose the content of any file not covered under the warrant to the investigators.

36. The terms "records," "documents," and "materials" include all of the items described in Attachment B in whatever form and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

a. **Computer Hardware** – Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, compact flash cards, smart media cards and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

b. **Computer Software** – Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way it works. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs, utilities, compilers, interpreters, and communications programs).

14

c. **Computer-related Documentation** – Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

d. **Computer Passwords and Other Data Security Devices** – Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

37. As previously set forth, the actual search of a computer and related software in the controlled environment of a laboratory is a complicated process which takes in excess of ten days to complete. It often takes weeks or months to complete. Against this background and based on my training and experience, I hereby request 60 days from the date of seizure to complete the search under controlled conditions.

## VI. STATEMENT OF PROBABLE CAUSE

38. Based on all of the facts and circumstances described in this affidavit for search warrant, along with my training, experience, and consultations with others, there is probable cause to believe that the items described in Attachment B are currently located at the premise described in Attachment A, that those items constitute evidence, fruits, and/or instrumentalities of violations of Conspiracy to Harbor an Illegal Alien and Induce an Alien to Enter the United States, 18 U.S.C. § 371 and Harboring an Alien for Financial Gain, 8 U.S.C. § 1324.

38. This investigation is ongoing and the subjects of the investigation are not aware that they are being investigated. Therefore, I request that the Court seal the search warrant, complaint, arrest

15

1   warrant until further order of the Court.

2

3   I declare under the penalty that the foregoing is true and correct to the best of my knowledge and

4   belief.

5

6   Executed on this _5_ day of June 2008, at San Francisco, CA.

7

8

9   JENNIFER V ALDERETE
    Special Agent
10  Immigration and Customs Enforcement

11

12  Sworn and subscribed before me on this _5_ day of June 2008.

13

14  BERNARD ZIMMERMAN
    United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                16

1

## ATTACHMENT A

2      The locations to be search are –

3      Residence: CYPRESS CREEK APARTMENTS, Apartment #64, 1011 Ygnacio Valley Road,
Walnut Creek, California, 94598. This residence is described as follows: The apartment building
4      is a two story building and is made of stucco. The building is mustard in color and is located at the
corner of Ygnacio Valley Road and Walnut Boulevard. Apartment #64 is located on the southwest
5      corner of the building on the second floor. Number "64" is visibly printed on the wall of the patio
of Apartment #64 and on the door of Apartment #64. The front door to the apartment is facing
6      North. The apartment is 900 square feet and one level.

7

8

9

10

11

12

13

14

15

16

17

18     Vehicle: 1997 Honda Accord license # 3XBH933, grey in color.

19

20

21

22

23

24

25

26

27

28

17

## ATTACHMENT B

1. <u>Documents Related to Bringing Pena's into the United States</u> – For the time period January 2002 to the present, any and all documents and records relating to attempting to bring and bringing Pena into the United States, including –

a. Records and documents relating to obtaining a visa for Pena's entry into this United States including, but not limited to, correspondence between individuals and DANN, La Rosa, "Sylvia", and Pena; phone numbers and addresses of La Rosa, "Sylvia", Pena and other unknown coconspirators; agreements or contracts between La Rosa, "Sylvia", DANN, Pena and other unknown coconspirators; payments for fees related to preparations in Peru, Embassy visits, itineraries, airline tickets for La Rosa and Pena; DANN's check book register, credit card statements; handwritten lists of costs associated with Pena.

b. Any agreement, emails or other correspondence between DANN, La Rosa, "Sylvia" or other unknown coconspirators to bring Pena into the United States, credit card charges, checks and cash showing payment for such agreement.

c. Agreement or contract documenting the conditions of Pena's employment in the United States.

d. Address and/or telephone notebooks and papers, including any computerized or electronic records, reflecting names, addresses, and telephone numbers of La Rosa, "Sylvia", DANN's mother, Pena or other unknown coconspirators.

e. Travel documents and records for La Rosa and Pena, including but not limited to, passports, visas, passport and visa applications, immigration applications and/or petitions, passport and visa photographs, airline tickets, boarding passes, and airline ticket receipts.

f. Photographs of co-conspirators La Rosa, "Sylvia", Pena, DANN's mother, or other unknown coconspirators.

g. Identity documents for Pena, including, but not limited to, birth certificates and/or documents which are or have been used by the INS as proof of alien registration or legal nonimmigrant status in the United States.

18

2. <u>Bank Related Documentation</u> –

    a. During the time period March 2007 to the present, any and all documents and records relating to a bank account opened at Washington Mutual in approximately March 2007 in the name of Pena, including bank statements, ATM cards, canceled checks, checkbooks, signature cards, bank deposit and withdrawal slips, cashier's checks, money orders, wire transfers, any transfers of money to or from this account, checking, savings, money market accounts or other accounts, safe deposit box information and keys, any documents associated with this account with Pena's signature.

    b. During the time period January 2002 through May 1, 2008, bank statements relating to any bank accounts held by DANN, indicating whether she paid or failed to pay Pena during the time period 2002 through April 2008.

3. <u>Pena's Personal Items</u> –

- Three blankets which are roughly 6 feet by 6 feet and described as (1) sky blue and white baseball print; (2) white blanket; (3) tan blanket;
- Beige sheet
- Black leather boots, approximately size 6, zip up, pointy toes, ankle length, tall heels;
- Small/medium, wool blue blazer with large buttons and a belt, and a striped white and black nylon lining, name brand "Gap";
- Brown jacket, the inside of which is red and green;
- Turquoise bathing suit;
- Red cotton vest, with cowl neck and elastic waist;
- Beige hooded sweater with feathers;
- Assorted T-shirts and undergarments;
- Sky blue pajamas and pink pajamas;
- Green and white pajamas;
- Battery operated toothbrush, white and green;
- Small white zipped bag containing makeup;

1     ● Purple bag containing perfume and candles;

2     ● Black leather purse without pockets, containing earrings;

3     ● Radio;

4     ● Black suitcase, without wheels, approximately 3 feet by 1 foot, with white lettering, handles

5         and a zipper and two pockets on each side;

6     ● Any letters or other correspondence written to or from Pena;

7     ● Passport, visa, Peruvian identification;

8     ● Pink sandals;

9     ● International calling cards.

10

11      4. <u>Any Other Items Documenting Pena's Presence in DANN's Residence</u> – Any and all records

12 relating to Pena's presence and work employment in DANN's residence including, but is not limited

13 to –

14           ●   Manilla index cards, approximately 5" by 3" in size, with handwritten chores for
Pena to perform, last seen on approximately April 15, 2008, in a drawer in the
15                kitchen near to the stove;

16           ●   DANN's handwritten or typed notes documented expenses relating to Pena
maintained on DANN's bedroom desk. Pena saw one of these accountings on
17                DANN's bedroom desk in February 2008;

18           ●   Digital camera, photographs, a video camera, and video tapes documenting Pena's
presence;
19

20           ●   DANN's cell phone;

21           ●   DANN's answering machine;

22           ●   2007-2008 calendar in the kitchen wall from Indian Valley School, in various colors,
with various animals;

23           ●   Black briefcase, containing Pena's passport, visa, and Peruvian identification.

24     5.   <u>Tax Documents</u> – DANN's tax returns, tax return information, copies of tax returns,

25 correspondence regarding taxes, and information returns relating to identifying claimed dependents

26 and domestic servants.

27

28

6.  Indicia of Occupancy – All documents relating to the occupancy of the premises and the use of the vehicles at the premises, including utility bills, correspondence, and driver's license.

7.  Computer Related Items – As stated above in Section V, paragraph 31, agents will use the protocol attached to hereto as Attachment C to search and seize computer systems located at the premise.

21